**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MARKIA BAKER; CORY SITTON, and REN HANCOCK, on behalf of Plaintiffs and the class members described below, | ) |
| Plaintiffs, | ) |
| v. | ) |
| AFS CS d/b/a Three Sticks Lending; TEAL ASSETS, LLC; and JOHN DOES 1-20, | ) |
| Defendants. | ) |

## COMPLAINT – CLASS ACTION

1. Plaintiffs bring this action to secure redress from predatory and unlawful loans made to Indiana residents (such as Exhibits A-C). The loans are ostensibly made by a Native American owned enterprise, Defendant AFS CS d/b/a Three Sticks Lending ("Three Sticks Lending"). They are in fact made by Teal Assets, LLC, a non-Native American enterprise.

2. Plaintiffs seek statutory damages under the Indiana Consumer Credit Code (Count I), treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1964 (Counts II-III), and compensation for unjust enrichment (Count IV).

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 18 U.S.C. § 1964 (RICO), 28 U.S.C. §1337 (interstate commerce), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1332(d) (Class Action Fairness Act).

4. On information and belief, there are more than 100 members of the class, and the amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

5. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to

Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi* , 622 F.3d 754, 760 (7th Cir. 2010).

6. Venue is proper because acts to obtain and collect the loans impacted Plaintiffs in Indiana.

7. Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiffs

8. Plaintiffs are citizens of Indiana residing as follows:

a. Markia Baker: Indianapolis, Indiana.

b. Cory Sitton: Bargersville, Indiana.

c. Ren Hancock: Edinburgh, Indiana.

### Defendants

9. Defendant Three Sticks Lending issues loans to consumers online through the website https://threestickslending.com/. (Exhibit D) It uses the addresses P. O. Box 1145, Mission, SD 57555 and 27565 Research Park Dr., Mission, SD 57555.

10. Defendant Three Sticks Lending claims to be a "wholly owned subsidiary of Rosebud Economic Development Corporation ('REDCO'), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of the Rosebud Sioux Tribe, a federally recognized sovereign American Indian tribe in South Dakota . . . ." (Exhibit D)

11. In fact, the lending operation is beneficially owned by Defendant Teal Assets, LLC, a Texas limited liability company located at 2902 Rivergrove Court, Ft. Worth, TX 76116-0804. The registered agent of Teal Assets, LLC is Theresa A. Greig at that address.

12. Teal Assets, LLC has filed a UCC-1 financing statement on "all assets of the debtor, including, but not limited to, any and all net receipts, receivables, net revenue, rents, present and future deposit accounts, consumer loan accounts, payments and proceeds related to any consumer loan accounts, participation rights related to any consumer loan accounts, consumer loan agreements, property and assets of debtor (real and personal, tangible or intangible), intellectual property of debtor, goods, money, accounts, payment intangibles, general intangibles, promissory notes, contract rights, documents and instruments, chattel paper (including electronic chattel paper), letters of credit, letters of credit rights, securities, securities accounts and security entitlements, guaranties, investments, investment property, insurance proceeds, any claims, commodity accounts

and contracts, financial assets, and any and all proceeds and products of any of the collateral. Collateral shall include any such described collateral whether now existing of hereafter acquired. Collateral also includes all books, records, data, plans, manuals, computer software object code, computer tapes, computer systems, computer disks, and computer programs pertaining directly or indirectly to the collateral." (Exhibit E)

13. By means of this security agreement and related agreements, Teal Assets, LLC has complete control over the assets and business of Three Sticks Lending.

14. John Does 1-20 are other natural or artificial persons who participated in the acts complained of.

## <u>FACTS</u>

## LOANS TO PLAINTIFFS

15. On the following dates, Three Sticks Lending made loans to Plaintiffs, as follows:

| Plaintiff | Amount | Annual Percentage Rate | Exhibit |
|---|---|---|---|
| Markia Baker | $1,200 | 649% | A |
| Cory Sitton | $2,520 | 538.42% | B |
| Ren Hancock | $2,115 | 466.97% | C |

The loans were made via the website https://threestickslending.com/.

16. Three Sticks Lending transferred the proceeds of the loan through the ACH network into Plaintiffs' bank accounts in Indiana.

17. The loan was to be repaid via ACH debits from Plaintiffs' bank accounts in Indiana.

18. Plaintiffs made some payments.

19. Plaintiffs have never set foot on tribal land or visited Mission, South Dakota.

20. Plaintiffs took the loans out from Indiana via the Internet, had the proceeds sent electronically to Indiana bank accounts, signed all loan documents in Indiana, received loan communications in Indiana, and had payments debited from Plaintiffs' accounts at Indiana banks.

## DEFENDANTS' OPERATIONS

21. Three Sticks Lending is purportedly owned by the Tribe.

22. In fact, the Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

23. In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

24. All essential business operations of Three Sticks Lending are performed in locations outside of the Tribe's jurisdiction.

25. These off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

26. These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance, and marketing.

27. While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

28. Supposedly, Three Sticks Lending Financial operates under a lending license granted by the Tribe, beholden only to Tribe's own "Financial Services Regulatory Authority," which, of course, permits lending at triple-digit interest rates.

29. Three Sticks Lending is beneficially owned and operated by Teal Assets, LLC (and its investors) and receives the overwhelming percentage of profits generated.

30. Thus, Teal Assets, LLC and , and not the Tribe, is the true lender of the loans made to Plaintiffs, because it has the predominant economic interest in the loans made to consumers via https://threestickslending.com/.

31. Since nearly all meaningful activity concerning the loans does not occur on an Indian reservation, regardless of whether certain administrative aspects are addressed on the Tribe's land,

the loans were not made "on" the reservation.

32. A significant majority of the transactions occur within Indiana—from completing the application to receiving the funds.

33. The location of the consumer determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

**RENT A TRIBE SCHEME AND INVALIDITY OF CLAIM OF TRIBAL IMMUNITY**

34. In an attempt to evade prosecution under usury laws of states like Indiana, online lenders frequently create an elaborate charade claiming their otherwise illegal businesses are entitled to the sovereign immunity of Native American tribes.

35. The illegal loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

36. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

37. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

38. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities']

method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

39. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

40. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

41. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

42. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

43. The excessive interest charges imposed by Defendants were intentional.

**INDIANA REGULATION OF LENDING**

44. The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans.

45. For loans other than supervised loans, Ind. Code § 24-4.5-3-201 provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

46. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
> > (a) the total of:
> >
> > > (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;
> > >
> > > (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
> > >
> > > (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or
> >
> > (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

47. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq*., but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

48. Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

> (1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.
>
> (2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).
>
> (3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).
>
> (4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

49. The amount of finance charge provided for in Exhibits A-C is more than double that permitted in Indiana under any provision.

50. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

> (1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .
>
> > (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.
> >
> > (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.*
> >
> > (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.
> >
> > (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

51. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered***

> ***even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .
>
> (7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.
>
> (8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . . (Emphasis added)

**COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE**

52. Plaintiffs incorporate paragraphs 1-51.

53. This claim is against all Defendants.

54. Because the loans made to Plaintiffs violated the rate limits set by Indiana law, and the violation was intentional, Plaintiffs and other borrowers are entitled to ten (10) times the amount of the excess charge.

**CLASS ALLEGATIONS**

55. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

56. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by "Three Sticks Lending" at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

57. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

58. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

59. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

60. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

61. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

62. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i. Statutory damages;

ii. Attorney's fees, expenses and costs; and

iii. Such other or further relief as is appropriate.

**COUNT II – RICO**

63. Plaintiffs incorporate paragraphs 1-51.

64. This claim is against Teal Assets, LLC, and John Does 1-20, who are the RICO "persons."

65. All loans made by "Three Sticks Lending" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

66. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

67. Three Sticks Lending is an enterprise affecting interstate commerce, in that it is

located outside of Indiana and makes loans to Indiana residents via the Internet.

68. Defendants Teal Assets, LLC, and John Does 1-20 are associated with this enterprise.

69. Defendants Teal Assets, LLC, and John Does 1-20 conducted or participated in the conduct of the affairs of Three Sticks Lending through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

70. Plaintiffs were deprived of money as a result.

**CLASS ALLEGATIONS**

71. Plaintiffs bring this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

72. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by Three Sticks Lending at more than 36% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

73. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

74. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether Three Sticks Lending is an "enterprise."

c. Whether Defendants Teal Assets, LLC, and John Does 1-20 are associated with the enterprise.

d. Whether Defendants Teal Assets, LLC, and John Does 1-20 conducted or participated in the affairs of Three Sticks Lending through a pattern of making and collecting unlawful loans.

75. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

76. Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

77. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants Teal Assets, LLC, and John Does 1-20 for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

**COUNT III – RICO**

78. Plaintiffs incorporate paragraphs 1-51

79. This claim is against Defendants Teal Assets, LLC, and John Does 1-20, who are the RICO "persons."

80. All loans made by Three Sticks Lending to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the loan was made on or after a date four years prior to the filing of this action, and (d) the usurious rate is at least twice the enforceable rate (36%).

81. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

82. Three Sticks Lending is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

83. Defendants Teal Assets, LLC, and John Does 1-20 conspired and agreed to operate Three Sticks Lending through a pattern of collection of unlawful debt, as set forth above, in

violation of 18 U.S.C. §1962(d).

84. Plaintiffs were deprived of money as a result.

**CLASS ALLEGATIONS**

85. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

86. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by Three Sticks Lending at more than 72% interest (c) which loan was made on or after a date four years prior to the filing of this action.

87. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

88. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether Three Sticks Lending is an "enterprise."

c. Whether Defendants Teal Assets, LLC, and John Does 1-20 agreed and conspired to make unlawful loans through Three Sticks Lending.

89. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

90. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

91. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

**COUNT IV – UNJUST ENRICHMENT**

92. Plaintiffs incorporate paragraphs 1-51

93. This claim is against all Defendants.

94. Defendants engaged in inequitable conduct by making loans in excess of the rate limits set by Indiana law, such that it would be unfair and result in unjust enrichment if Defendants were not forced to disgorge the interest they obtained.

**CLASS ALLEGATIONS**

95. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

96. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made by "Three Sticks Lending" at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

97. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

98. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

99. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans, and whether Defendants are thereby unjustly enriched.

100. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

101. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

102. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i. Appropriate monetary relief;

ii. Costs; and

iii. Such other or further relief as is appropriate.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Julie Clark
Caileen M. Crecco
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
dedelman@edcombs.com
jclark@edcombs.com
ccrecco@edcombs.com

## JURY DEMAND

Plaintiffs demand trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\40908\Pleading\Complaint - 3 plaintiffs_Pleading.WPD

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\40908\Pleading\Complaint - 3 plaintiffs_Pleading.WPD